# Exhibit "A"

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

BONNIE DANIELL, individually and on
behalf of all others similarly situated,

      *Plaintiff,*

      v.

SEMPRIS, LLC, a Delaware limited liability
company, E. MISHAN & SONS, INC., a New
York corporation d/b/a EMSON, INC., and
QUALITY RESOURCES, INC., a Florida
corporation,

      *Defendants.*

Case No. 2012 CH 44123.

Judge Diane Larsen, Calendar 7

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Bonnie Daniell brings this Second Amended Class Action Complaint against

Defendants Sempris, LLC ("Sempris"), E. Mishan & Sons, Inc. d/b/a Emson, Inc. ("Emson"),

and Quality Resources, Inc. ("Quality Resources") (hereinafter collectively "Defendants") on her

own behalf, and on behalf of Classes of similarly situated individuals who were deceptively

enrolled in and charged for Sempris Membership Programs. Plaintiff alleges as follows upon

personal knowledge to herself and her own acts and experiences and, as to all other matters, upon

information and belief, including investigation conducted by her attorneys.

### NATURE OF THE ACTION

1.    Defendants work together to charge consumers recurring monthly fees for

"Membership Programs" that purport to offer discounts, coupons, and other money saving deals.

Using the sale of a legitimate product the consumer actually desires as bait, Defendants acquire

consumers' billing information and then use this information to trick consumers into enrolling in

and paying for memberships in one or more of their valueless recurring-fee programs.

2.    Defendants employ several deceptive practices, including post-transaction,

negative option marketing as well as the use of a "data pass" or "pre-acquired account marketing," which has been recognized by Congress as an especially deceptive and misleading form of marketing.

3.     The fraud is perpetuated in the following manner: First, an unknowing consumer visits one of Emson's websites to purchase an advertised product (usually an "As Seen on TV" product advertised via infomercial or online). In order to make a purchase, the consumer provides his/her private billing and contact information. However, rather than protect the sensitive information shared by the consumer (as any consumer would reasonably believe), Emson transfers this information to its business partner—Quality Resources—who then uses it to initiate unsolicited telephone calls to consumers marketing Sempris Membership Programs.

4.     Under the guise of verifying the consumer's Emson order, Quality Resources contacts consumers using the telephone number they provided to Emson during the purchase of their original product. From the outset of the call, Quality Resources is already in possession of the consumer's billing information (such as certain billing information, including all or part of the consumer's credit or bank card number and billing address) that Emson provided or made available to it as part of the data pass.

5.     After going through the order details for the Emson purchase (a step again designed to trick consumers into believing the call is related to their Emson order), the Quality Resources operator begins to aggressively market Membership Programs offered by Sempris and other vendors. Operators are trained to make purposefully deceptive and misleading representations about the programs (such as the consumer's ability to review membership written materials and cancel membership before being charged recurring fees), obscure and conceal material terms of the programs, and purport to offer low-cost introductory offers and gift cards or

2

vouchers as incentives to "try" out each program. Consumers who are tricked into agreeing to the introductory trial are subsequently enrolled in and charged for a recurring monthly subscription to one or more Membership Programs.

6. Following their enrollment, however, consumers routinely fail to receive the written membership information and incentives promised during the call, as Sempris purposefully delays or fails to send such materials. Accordingly, consumers are often completely unaware that their membership enrollment has been processed and are unable to utilize any of their alleged program benefits or cancel their trial membership before being charged full membership fees.

7. Working together, Defendants have systematically defrauded consumers by deceptively enrolling and charging them for Membership Programs. Each Defendant is jointly and severally liable, and together, Defendants share in the profits generated by their fraudulent scheme.

## PARTIES

8. Plaintiff Bonnie Daniell is a natural person and citizen of the State of Illinois.

9. Defendant Sempris, LLC, is a marketing services company that operates numerous "Membership Programs," including the membership program at issue in this case— "Budget Savers." Sempris is incorporated and existing under the laws of the State of Delaware, with its principal place of business located at 11100 Wayzata Boulevard, Suite 680, Minneapolis, Minnesota. It does business throughout the United States, the State of Illinois, and this County. Until early 2011, Defendant Sempris operated its same Membership Programs under the corporate name Provell, Inc. On information and belief, Sempris is also presently doing business as ValusDirect, LLC.

3

10.    Defendant Emson, Inc. manufactures, markets, distributes and/or sells a wide range of consumer products, including products commonly marketed as "As Seen on TV," directly to consumers via television infomercials, websites, and other e-commerce means. Emson also sells its products to retailers wholesale, such as department stores and mass merchandisers. Emson is a corporation incorporated and existing under the laws of the State of New York with its principal place of business at 230 Fifth Avenue, New York, New York. It does business throughout the United States, the State of Illinois, and this County.

11.    Defendant Quality Resources, Inc. is a marketing services provider that specializes in customer acquisition for subscription-based products, such as and including Sempris Membership Programs. Quality Resources is a corporation incorporated and existing under the laws of the State of Florida, with its principal place of business at 19321 C US Highway 19 N, Suite 200, Clearwater, FL. It does business throughout the United States, the State of Illinois, and this County.

### JURISDICTION & VENUE

12.    The Court has personal jurisdiction over this action pursuant to 735 ILCS 5/2-209(a)(1) because Defendants conduct business in Illinois, Plaintiff Daniell is a resident of Illinois, Defendants committed tortious acts within Illinois, and the conduct giving rise to Plaintiff's claim occurred in Illinois.

13.    Venue is proper because Defendants conduct business in Cook County, Plaintiff resides in Cook County, and the causes of action arose, in substantial part, in Cook County. Specifically, Plaintiff made the purchase at issue here in Cook County, was contacted by Defendants over the phone in Cook County, and was charged for both the product she purchased and the Sempris Membership Program in Cook County.

4

<u>FACTS COMMON TO ALL COUNTS</u>

**Data Pass and Preacquired Account Marketing**

14.     Preacquired account marketing is a widespread and problematic practice whereby a third party is given access to a consumer's private billing information by a business partner who received this information through a prior, unrelated Internet or telephonic transaction. The "merchant partner" who acquired the billing information then passes all or some of it onto (or otherwise makes it available to) the third party as part of a financial arrangement wherein the original merchant is paid a fee. This sharing of consumer information is commonly referred to as a "data pass."

15.     In a majority of instances, consumers do not consent to the sharing of their information in this manner and are more often than not completely unaware that a merchant has transferred their information to a third party.

16.     Following the data pass, consumers are commonly marketed and enrolled in a membership program with a recurring monthly subscription. Any arguable benefits that exist from the membership programs (in reality, there are essentially none) go unrealized because the overwhelming majority of consumers are unaware they have been enrolled in these clubs and/or programs in the first instance. Third party sellers and their merchant partners, however, are completely aware of the deceptive nature of this business model and the legion of consumer complaints made directly to them as well as existing on the Internet.

**The Government Investigates and Bans Data Pass Practices**

17.     As a result of the deceptive nature of this type of marketing (and the thousands of complaints that have arisen because of it), the Senate Committee on Commerce, Science, and Transportation conducted an investigation of misleading e-commerce marketing practices in 2009, focusing its investigation on companies with the same business model as Sempris.

18.     In November 2009, the Committee released a staff report entitled "Aggressive Sales Tactics On the Internet and Their Impact On American Consumers." The report specifically described the process of "Data Pass" and "Preacquired Account Marketing," stating that the "this 'data pass' or 'card on file' process—where a third party company obtains a consumer's billing information not directly from the consumer, but from a website where the consumer has just made a purchase—is a well known and controversial practice" that has caused numerous consumer complaints and confusion.

19.     In response to the Senate Investigation, Congress passed the Restore Online Shoppers' Confidence Act ("ROSCA") in 2010.[1] Although ROSCA specifically targeted Internet based marketing (as opposed to those offers made over the phone), Section 8401 of ROSCA recognized the following:

> (3) An investigation by the Senate Committee on Commerce, Science, and Transportation found abundant evidence that the aggressive sales tactics many companies use against their online customers have undermined consumer confidence in the Internet and thereby harmed the American economy.
>
> (4) The Committee showed that, in exchange for "bounties" and other payments, hundreds of reputable online retailers and websites shared their customers' billing information, including credit card and debit card numbers, with third party sellers through a process known as "data pass". These third party sellers in turn used aggressive, misleading sales tactics to charge millions of American consumers for membership clubs the consumers did not want.

20.     ROSCA banned the "data pass" process and required third-party sellers to both disclose all material terms of the transaction and obtain express informed consent from consumers, including the consumer's full account number and address, before charging their account.

---

[1]     Restore Online Shoppers' Confidence Act, 15 U.S.C.A. § 8401 *et. seq.*

**Sempris's Documented History of Deceptive Marketing**

21.    Like the companies named in the Senate Committee's Report, Defendant Sempris

is a marketing company that offers subscription-based, negative-option "Membership Programs"

purporting to offer discounts and services to "subscribing" consumers.

22.    However, despite costing membership fees of as much as $29.95 a month, these

programs offer little real value and are rarely utilized by membership subscribers (many of

whom are unaware that they have even been enrolled). Furthermore, the ostensible "savings" or

"coupons" offered under such programs go mostly untouched and instead, are listed merely to

promote the appearance of legitimacy.

23.    Despite this fact (or perhaps due to it), Sempris has enrolled and continues to

enroll hundreds of thousands of subscribers into its Sempris Membership Programs, including

Budget Savers, and charges such consumers recurring membership fees.

24.    Sempris Membership Programs include, but are not limited to: Value Plus,

Budget Savers, Cooking in Style, Essentials for Home, Explore USA, FunSource, Homeplay,

Pulse, and Vacation Passport. Sempris has also partnered with various merchants to create

"Custom" Programs, such as: Glamour in You and Duets (for Frederick's of Hollywood), Chase

Ultimate Rewards Plus (for Chase Manhattan Bank), and JC Whitney Buyers Plus (for JC

Whitney). Consumers are enrolled in Sempris Membership Programs over the phone and online.

25.    Sempris has operated the same deceptive business practices for the past ten years.

Previously operating as Provell, Inc., and before that, Damark International, Inc., Sempris's

practice of fraudulently enrolling and charging consumers for its Membership Programs (as well

as its propensity for changing its name to evade liability) has been well documented over the past

decade. On information and belief, Sempris has additionally been operating under the name

7

ValusDirect, LLC.

26.     Sempris's business practices previously resulted in an investigation and complaint filed against it by the Minnesota Attorney General in 1999, forcing Sempris (then operating as Damark International Inc.) to issue an official Assurance of Discontinuance.[2]

27.     Despite its Assurance of Discontinuance, Defendant simply changed its name to Provell, Inc. and resumed its deceptive business practices—namely, using preacquired information to deceptively enroll consumers in its Membership Programs.

28.     After operating as Provell for close to a decade and accumulating thousands of consumer complaints under that name, Defendant simply changed its business name again, this time to Sempris.

29.     Ultimately, hundreds of consumer complaints about the deceptive nature of Sempris' Budget Savers membership enrollment and charges (spanning the course of several years) can be found throughout the Internet on consumer protection websites.[3]

**Defendants Jointly Conspire to Deceptively Enroll and Charge Consumers**

30.     Emson and Quality Resources are co-conspirators in Sempris's enrollment scheme and have partnered with Sempris to design and jointly implement a system whereby consumers would be unknowingly and deceptively induced into enrolling in Sempris's Membership Programs.

---

[2]     Assurance of Discontinuance, *Minnesota ex rel. Hatch v. Damark Int'l, Inc.*, No. C8-99-10638 (Ramsey County Dist. Ct. Dec. 3, 1999).

[3]     *See,* e.g. http://www.complaintsboard.com/bycompany/budget-savers-a46060.html (listing more than 80 consumer complaints about Budget Savers); http://www.consumeraffairs.com/retail/budget-savers.html (listing twenty consumer complaints about Budget Savers.) Both sites last visited on August 20, 2013.

*Emson Acts as a Conduit for Passing Along Consumer Contact, Billing, and Order Information for Quality Resources and Sempris's Telemarketing Purposes.*

31.    As the initial point of consumer contact, Emson directly markets and sells its products, such as the Super Wave Oven, over the television and Internet. Interested consumers who visit an Emson website to make an online purchase (i.e. www.sharperimageoven.com or www.superwaveoven.com) are presented with the Emson brand logo prominently displayed on both the homepage and order page.

32.    To complete their online purchases, consumers are required to submit their private billing and contact information on the Emson website, including their telephone number, address, and email. At no point during the process does Emson disclose that the consumer's private information will be transferred to any other entity for marketing purposes. Nor are consumers required to view, check a box, or otherwise indicate their consent or acceptance to any terms and conditions or privacy policy governing their purchase. And to the extent any terms are displayed *somewhere* on Emson's website, such terms do not disclose that Emson will provide consumers' personal billing information to disreputable companies like Sempris.

33.    Unbeknownst to the consumer, however, and in breach of any supposed privacy policy or other terms and conditions, Emson and/or an agent acting on Emson's behalf immediately transfers the consumer's private information to Quality Resources (a third party telemarketer) upon receipt. The transferred information includes the consumer's full name, telephone number, e-mail, and address, as well as details regarding the consumer's Emson order, including partial billing information.

*Under the Pretext of Verifying the Consumer's Emson Order, Quality Resources Contacts Consumers to Market Sempris Membership Programs.*

34.    Upon receiving the consumer's information, a Quality Resources telemarketer contacts the consumer using the telephone number he/she recently provided to Emson. The call,

9

which takes place within days of the consumer's Emson order, is falsely presented as being made for the purposes of verifying or confirming the details of the consumer's purchase of an Emson product. The caller specifically indicates the call is to "make certain everything was covered with you today" related to the prior purchase.

35.    The Quality Resources telemarketer refers to the specific Emson product that the consumer ordered by name and goes through order information, such as the consumer's address and contact information, before assuring the consumer that the order will be arriving shortly. In reality, the call has no effect or relation to the Emson order, which has already been completed online, and such statements are merely included so as to trick the consumer into believing the call is connected to his or her prior purchase.

36.    Not only is Emson aware that Quality Resources uses its orders as a pretext for calling consumers, it actively encourages and participates in the deception by providing Quality Resources with the consumer's order details—an act that contributes to consumer confusion about the nature of the telemarketing call and allows Quality Resources to gain the consumer's trust and attention. On information and belief, Emson and Quality Resources profit each time a consumer is deceptively enrolled into Budget Savers.

37.    Further, even when the telemarketer states that he/she is calling from Quality Resources, such a distinction is meaningless to the consumer, as the consumer has no prior knowledge of or relationship with the named entity. Rather, the telemarketer quickly refers to the consumer's order and states that the call is recorded for "consumer protection" and "quality assurance" purposes, leading consumers to reasonably believe that the call is related to their prior Emson purchase.

***Quality Resources Follows a Purposefully Deceptive Marketing Script Designed to Trick Consumers Into Enrolling.***

38.     After creating the impression that the phone call is related to the consumer's Emson order—and thereby assuring that the consumer will stay on the line and not hang up the phone—Quality Resources launches into one or more scripted marketing pitches to sell membership programs offered by its contractual partners, including Defendant Sempris.

39.     Telemarketers are trained to make purposefully deceptive and misleading representations about the program, such as the consumer's ability to review written membership materials and cancel membership before being charged recurring fees, to obscure and conceal material terms of the programs, such as when trial periods end and recurring membership fees begin, and purport to offer low-cost introductory offers and gift cards or vouchers as incentives for enrollment.

40.     Telemarketers are further trained to deflect consumer questions about the nature of each program offer, its relationship to the consumer's Emson order, and each program's corresponding terms and conditions, with scripted and evasive answers. When consumers specifically ask about cancelling or the timing of charges, they are falsely assured that "everything will come out to" them in writing in the mail and that they will have the opportunity to cancel.

41.     In reality, the timing and wording of the offers are purposefully designed to obscure material terms, confuse callers with "free" trials and other gifts, and induce consumers to consent to enrollment, all while obscuring and/or concealing the fact that the membership programs are negative option services that will automatically and perpetually be billed to a consumer's account.

42.     To add to consumer confusion, Quality Resources purposefully pitches several

11

membership programs during the same call, combining offers for Sempris Membership Programs with those offered by other third parties. Each offer is similarly scripted to include a low-cost trial period and gift cards or vouchers as incentives to join, promises of sending written membership information to the consumer through the mail, and purport to offer the same opportunities for consumers to call and cancel "at any time" to avoid being charged. The similarity of the offers' terms confuses consumers into thinking they are actually the same programs, and consumers therefore fail to write down the different, though confusingly similar, cancellation numbers associated with each program.

43.    As Quality Resources is paid a commission for each consumer they enroll, they are further incentivized to misrepresent or omit material terms of the membership programs so as to induce enrollment.

44.    At no point is the involvement of Sempris or any other third party ever disclosed—again leading consumers to believe that the marketed programs are offered by Emson (the same entity behind their previously referenced order).

45.    Quality Resources likewise refers back to the consumer's Emson purchase during each pitch, asking the consumer to repeat the specific credit or debit card number that he/she used for their Emson purchase for "confirmation" purposes, and further misleading consumers as to the purpose and entity behind the call. To prompt consumers to refer back to the card, Quality Resources recites specific card details, such as the first or last four digits of the card number and/or credit card merchant. By demonstrating that it is already in possession of the consumer's private billing information, consumers are again led to believe that they are still dealing with Emson (the only entity the consumer had previously provided their information to) or that the offer they are being told about is connected with that prior purchase.

46.     After being presented with the barrage of offers (each intentionally designed to create confusion as to the price, terms, source, and benefits of the program), consumers are induced into saying "okay" to trying out one or more trial memberships.

47.     After deceptively obtaining such consumer "consent," Quality Resources transfers the consumer's billing and contact information to Sempris for processing, and the consumer is subsequently enrolled into and charged for the program(s) by Sempris.

***Sempris Denies Consumers Any Meaningful Opportunity to Use or Cancel Their Membership
Before Being Charged Recurring Fees.***

48.     Sempris is aware of the deceptive representations used by Quality Resources to enroll consumers. Sempris accesses and reviews audio-recordings of the enrollment phone calls provided by Quality Resources under the parties' agreement. Further, Sempris specifically drafts certain deceptive terms, such as those delineating the program's trial period and promised enrollment incentives, and requires Quality Resources to include such terms in its sales pitches.

49.     After receiving the consumer's information from Quality Resources, Sempris immediately bills the $1 introductory fee to the consumer's account and begins calculating the membership trial period (usually 14 days). However, rather than send written membership materials to the consumer as promised (including the information necessary for the consumer to utilize program benefits and instructions on how to cancel before being charged), Sempris serially delays or completely fails to send the materials altogether. Accordingly, consumers are often completely unaware that their membership has been processed or effectuated and are denied any meaningful opportunity to try out the program's supposed benefits or cancel membership before the expiration of their trial period and the start of recurring charges.

50.     Further, Sempris serially fails to deliver the gift cards, gas vouchers or other promised gifts to consumers as incentives for enrollment.

51.     Defendants are jointly liable, and together, share in the profits generated by their fraudulent scheme.

### FACTS REGARDING PLAINTIFF BONNIE DANIELL

52.     On or around July 1, 2012, Plaintiff Bonnie Daniell visited Defendant Emson's website (www.sharperimageoven.com) to purchase Emson's "Super Wave Oven."

53.     Plaintiff followed Emson's instructions on how to order the oven online and entered her personal billing and contact information to complete her purchase. Specifically, Plaintiff was required to provide Emson her e-mail address, telephone number, credit card information, and billing address.

54.     At no point during the transaction did Emson clearly disclose that it would be sharing her information with any third party. Likewise, Emson failed to disclose that it would share her information with any disreputable third party like Sempris. Nor was Plaintiff required to consent to any "Privacy Policy" or "Terms and Conditions" as a condition of her purchase. Emson likewise did not indicate that there would be any type of follow up or confirmation phone call as a result of the purchase.

55.     In reliance upon Emson's failure to disclose its information sharing policies, and believing that her private information would be protected from disclosure, Plaintiff submitted the requested information and completed her Super Wave Oven purchase. Had she known that Emson would thereafter share her private information with Quality Resources for telemarketing purposes, she would not have placed her Emson order.

56.     Immediately following her order, Plaintiff received an e-mail from Emson confirming her purchase. The e-mail contained the details of her purchase, along with the following statement: "***NOTICE: This order qualifies for $115 in gifts! Click here to Claim:

14

[URL omitted] ***" The URL linked to a membership enrollment page for a Sempris Membership Program.

57.     The statement was positioned directly before and immediately after Plaintiff's order information and appeared to be part of her order description. Nothing in the e-mail indicated that the offer was from anyone other than Emson.

58.     Plaintiff, however, did not click on the link and did not view a Sempris Membership Program enrollment page. Nor did she agree to enrollment in any Membership Programs during any part of the check out process.

59.     Shortly thereafter, on or around July 6, 2012, (and potentially prior to July 4th) Plaintiff received a phone call from Quality Resources. At the outset of the call, the telemarketer was already in possession of Plaintiff's name, address, phone number, and, as the telemarketer would indicate later in the call, at least the first four digits and last four digits of Plaintiff's credit card number used during her Super Wave Oven purchase.

60.     After being notified that the call was regarding her Super Wave Oven order, Plaintiff was placed on hold. A few moments later, she was taken off hold and connected with an operator, who stated that he was "Daniel Caron at Quality Resources" and "wanted to make certain that everything was covered with [her] today."

61.     Plaintiff was not aware of who Quality Resources was and believed that the call was connected to her Super Wave Oven order.

62.     The Quality Resources telemarketer claimed that the call was to verify Plaintiff's Super Wave Oven order and would be recorded for "consumer protection" and "quality assurance" purposes. These representation were not true, as the call was to market Sempris's Budget Savers program and other programs.

15

63.     After next going over Plaintiff's address and order information, the telemarketer

stated "And your Super Wave Oven will be arriving out to you shortly. Definitely keep an eye

out for it. We do appreciate that." That representation was merely designed to mislead Daniell

into thinking the call was related to her Super Wave Oven purchase, and as a result she did

believe the two were related.

64.     In the same breath, the telemarketer launched into the first of several marketing

pitches, starting with Sempris's Budget Savers Membership program, describing the program's

supposed benefits with a single sentence: "of course, Budget Savers is going to save you money

at thousands of stores, restaurants, even on the groceries."

65.     The entire Budget Savers pitch—consisting of nearly 200 words quickly recited in

45 seconds—twice repeated that Plaintiff would receive "$120 in gasoline vouchers" simply for

trying out the program, but failed to clearly disclose that the membership was negative-option

(meaning Plaintiff would be perpetually billed until she called to cancel), or that Plaintiff's

consent to the $1 "introductory" trial would lead to monthly charges of $29.95.

66.     Rather, the only mention of the membership's price terms were (confusingly)

stated as follows:

> "And just remember, Budget Savers will automatically bill the $1 introductory fee
> to the [Discover card] with the last four numbers [xxxx] within one to five days.
> And it's only after the first 14 days, unless you do call to cancel, that's when
> they'll automatically bill the membership fee, the $29.95, at about the same time
> each month to the same card."

67.     The telemarketer similarly failed to clearly disclose the actions that Plaintiff

would have to take to cancel the membership and avoid being charged. Although the

telemarketer quickly stated that Plaintiff could "certainly call and cancel at any time" and

provided Plaintiff with a number with which to do so, the telemarketer did not advise Plaintiff to

16

be prepared to write the number down, offer to repeat it, or explain that Plaintiff *had* to call the number to cancel or face recurring monthly charges of $29.95. Instead, the telemarketer assured Plaintiff that the number would be included "in the package" for her and that such materials would be arriving "shortly" and "soon."

68.     The telemarketer then concluded the Budget Savers pitch by stating "so it's with your approval you'll be billed on the terms I just described, and I'll send those materials in the mail in writing for you and your family to enjoy," and asking, "all right?"

69.     Based on the telemarketer's confusing representations, Plaintiff did not reasonably understand the offer being presented and believed that the offer was related to her prior purchase. Thus, in reliance upon the telemarketer's misrepresentations about the nature and terms of the program (including that she would not be billed until the end of her introductory period, that cancellation materials would be included "in the package" for her, and that she would receive "those materials in the mail in writing"), Plaintiff replied "okay." Plaintiff was not aware that she was consenting to enrollment in a negative-option program that would immediately and perpetually bill her $29.95 a month until she affirmatively called to cancel and further believed that she would have the opportunity to review materials sent to her in writing and call and cancel "at any time" before the "first 14 days" were up. Likewise Plaintiff was not aware that Sempris would fail to timely send her the written package containing the information she would need to cancel.

70.     The telemarketer next asked Plaintiff to disclose the month and day of her birthday for "confirmation purposes." After Plaintiff entered the numbers on the keypad, the telemarketer claimed that the date "came back perfect" and further, that it showed Plaintiff had purchased her Super Wave Oven with a specific credit card.

17

71.     However, Plaintiff had never previously disclosed her birthday to Emson, Quality Resources, or Sempris.

72.     The telemarketer then asked Plaintiff to "go ahead and read back the same card" she had used for her Super Wave Oven purchase "for security and to confirm Budget Savers." Plaintiff thereafter repeated the card number she had previously used, including the card's expiration date, whereupon the telemarketer again stated that the information "came back perfect."

73.     After completing the pitch for Budget Savers, the telemarketer asked Plaintiff to "keep [her card] handy" because he was going to "go over that with [her] one last time in just a moment."

74.     In reality, the telemarketer needed Daniell to hold onto the credit care because, following the script, he was about to pitch her a different, though confusingly similar, membership program called "Shoppers Advantage" and then another one, "Great Fund." These two subsequent pitches were both for similar sounding membership programs that promised to provide similar money-saving discounts, gift cards and rebates for a $1 introductory price as a "bonus" and to thank her for being a "valued customer."

75.     During the course of the telephone call, Plaintiff repeatedly expressed her confusion with the purpose of the call and the differences between the offered programs. For instance, after each of the pitches, Plaintiff asked questions such as: "Is that different than the first thing you told me about?" and "I'm getting that automatically, too?" Plaintiff was not aware that the programs were offered by Sempris or any other third parties and believed that the offers were "automatically" associated with her Emson Super Wave Oven purchase.

76.     Most tellingly, when Plaintiff directly asked the telemarketer "you're signing me

18

up for *all* this shit? Do I have to?", the telemarketer simply replied: "*Everything* does come out to you in the mail in writing. It does sound a little bit overwhelming. Remember, *everything* does come out to you in the mail in writing. And that 30-day trial period, Bonnie, doesn't start until you receive that package in the mail. So you have that 30 days to use your benefits for the dollar." The telemarketer's answer that "everything" would come out in writing was designed to confuse and actually did confuse Plaintiff into believing that the telemarketer's statement applied to all of the pitched programs, including Budget Savers. Reasonably relying on this false representation that *everything* would come out to her in writing, she agreed to receive such information for her review.

77.      Likewise, after the telemarketer attempted to cram a *third* program onto Plaintiff's credit card, the following exchange occurred:

*Plaintiff*:       What -- was this a third thing?

*Telemarketer*: That was your last and final program. I was required to let you know about it.

*Plaintiff*:       Okay. And I'm getting that automatically, too?

*Telemarketer*: Oh, no, ma'am, you're not committed in any way to remain a member. Keep in mind we don't know where you shop or spend your money. That's why we let you look over the trial in writing, so that you can see which one is gonna be beneficial for you and the family.

*Plaintiff*:       Gotcha. Okay.

*Telemarketer*: And remember, that 30-day trial period doesn't start until you receive that package in the mail.

78.      The telemarketer's: (1) refusal to provide a clear answer as to whether Plaintiff was required to sign up for the programs, including Budget Savers, and (2) whether the sign up process was automatic, both were intentional statements, included in the telemarketer's script, designed to confuse Plaintiff and other consumers. By deflecting Plaintiff's question with the

19

assertion that all materials would be provided in writing, the telemarketer intentionally gave the false impression that no recurring monthly charges would occur unless and until Plaintiff had received the materials in writing and only then could she choose to affirmatively take part in the program. The telemarketer's statements purposefully omitted any details of the negative option in response to Plaintiff's questions and failed to indicate that Budget Savers was a separate program and that materials would not be forthcoming within sufficient time to cancel prior to the imposition of recurring charges.

79.     The telemarketer also indicated multiple times to Plaintiff throughout the call that the offered trial periods would not start until she received her welcome packet or referenced the "14 day trial period" but did not indicate the dates on which it would start or end. Likewise, the telemarketer did not indicate the specific date on which Plaintiff would be charged. The telemarketer intentionally intermixed his references to all three offered programs in order to further confuse Plaintiff and conceal the true nature of the Budget Savers program.

80.     In reasonable reliance upon the telemarketer's representations that she would have the opportunity to "look over the trial(s) in writing," that all relevant information regarding program benefits and cancellation procedures would be "included in the package for her," and that the trial periods wouldn't start until she received her information in the mail, Plaintiff said "okay" to trying out the three offered programs. Plaintiff did not reasonably understand that she was "consenting" to be charged for three different monthly membership programs that ostensibly offered "money saving" opportunities. Nor did she understand that each monthly charge would continue indefinitely until she called to cancel or that the trial periods would begin before she received any opportunity to review her membership materials. Nor did she believe that Sempris would fail to timely send her the written package materials containing the information she would

need to cancel any enrolment.

81.    Had Plaintiff known that the telemarketer's representations were false, she would not have said "okay" to trying out any of the marketed programs, including Budget Savers.

82.    In the month that followed, Plaintiff did not receive any Budget Savers membership materials in the mail or any notice that her Budget Savers trial membership had commenced.

83.    A few weeks after the phone call, and *having never received any membership materials in the mail as promised*, Plaintiff was charged $1.00 and then $29.95 for the Sempris Budget Savers Membership Program. Plaintiff continued to be charged $29.95 a month in August and September, until she noticed the charges on her statement and called the number listed to cancel in late September.

84.    Plaintiff had never received any of the promised membership information relating to the Budget Savers program and had no reason to believe that she would be charged. Plaintiff informed the customer service representative that she did not know what the charges were for and that she did not want to be enrolled. The customer service representative thereafter cancelled Plaintiff's membership to Budget Savers but stated that he could not authorize a refund to her account.

85.    A few days later (on or around September 24, 2012), and in direct contravention of the telemarketer's repeated promises that Plaintiff would received the membership materials prior to the imposition of charges, Plaintiff received a letter from Sempris in the mail. The letter contained her membership subscriber number, details about the Budget Savers Membership Program (including the supposed benefits of the program and how to utilize them), how to cancel membership, and the program's terms and conditions. Plaintiff received this letter more than

*three months* after Defendants enrolled her in the program and only after she called to stop the charges. Further, the letter confusingly and falsely stated that she had authorized Sempris to "charge [her] a $1.00 trial fee *today*" and that subsequent membership charges would begin after her 14-day free trial "on approximately July 21, 2012." (emphasis added.)

86.     The letter also claimed that the Budget Savers program would provide savings on dining, entertainment, and household purchases and listed specific companies from which members could receive discounts, i.e. Advance Auto Parts, Restaurant.com. However, on information and belief, many of the supposed companies that Sempris lists in its membership materials as providing discounts to enrollees do not even know Sempris is using their company names to market the Budget Savers program. Further on information and belief, most (if not all) consumers cancel within days of learning they are enrolled in Budget Savers and incurring such fraudulent charges, and few if any consumers ever even attempt to utilize Budget Savers' supposed benefits because of the time and work involved in trying to achieve any savings.

87.     On or around September 28, 2012, Plaintiff received another letter from Sempris, this time confirming the cancellation of her membership and denying her request for a refund.

## CLASS ALLEGATIONS

88.     Plaintiff brings this action pursuant to 735 ILCS 5/2-801 on behalf of herself and a Class and Subclass (collectively the "Classes") of similarly situated individuals, defined as follows:

> **Sempris Class:** All individuals in the United States from December 13, 2006 to the present who were telephonically enrolled by Quality Resources using the same script that was used to enroll Bonnie Daniel into Sempris's Budget Savers Membership Program following the individual's purchase of at least one Emson product from an Emson website.

> **Illinois Subclass:** All Sempris Class members who reside in the State of Illinois.

22

Excluded from the Class and Subclass are: 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; 3) counsel for Plaintiff and Defendants; 4) persons who properly execute and file a timely request for exclusion from the class; 5) the legal representatives, successors or assigns of any such excluded persons; and 6) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants. Plaintiff anticipates amending the Class and Subclass definitions following additional discovery.

89.     **Numerosity:** The exact number of the members of the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. Defendants have deceived thousands of consumers who fall into the definition set forth above. Members of the Classes can be identified through Defendants' records, including their electronic databases and other repositories of electronic data and information.

90.     **Appropriateness:** This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of

decisions will be ensured.

91. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff. Moreover, Plaintiff's claims are typical of the claims of the other members of the Classes, as Plaintiff and the other Class and Subclass members sustained damages arising from Defendants' uniform wrongful conduct.

92. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes. Those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

a) Whether Defendants' conduct described herein constitutes violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS § 505/1, *et seq.*);

b) Whether Defendants Emson and Sempris's conduct described herein constitutes breach of written or oral contract;

c) Whether Defendants' conduct described herein constitutes fraud by omission;

d) Whether Defendants Sempris and Quality Resources's conduct described herein constitutes fraudulent misrepresentation or fraud in the inducement;

e) Whether Defendants have been unjustly enriched as a result of their conduct described herein such that they should be disgorged of such monies or ordered to make restitution; and

f) Whether Plaintiff and the Classes are entitled to relief, and the nature of such

24

relief.

## FIRST CAUSE OF ACTION
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS § 505/1, *et seq.*
### (Individually and on behalf of the Illinois Subclass)

93.     Plaintiff incorporates by reference the foregoing allegations.

94.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")

(815 ILCS 505/1, *et seq.*) protects both consumers and competitors by promoting fair

competition in commercial markets for goods and services.

95.     The ICFA prohibits any unlawful, unfair, immoral or unscrupulous business

practices. The ICFA also prohibit fraudulent business acts or practices including the employment

of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the

concealment, suppression, or omission of any material fact.

96.     The ICFA applies to Defendants' actions and conduct as described herein because

it protects consumers in transactions that are intended to result, or which have resulted, in the

sale of goods or services.

97.     Defendants are "persons" as defined under section 505/1(c) of the ICFA.

98.     Plaintiff and each member of the Subclass are "consumers" as defined under

505/1(e) of the ICFA.

99.     Emson's "As Seen on TV" products and Sempris' Membership Programs are

"merchandise" within the meaning of section 505/1(b) and their sale is considered "trade" or

"commerce" under the ICFA.

100.     As described herein, Defendants have engaged in unfair or deceptive acts or

practices and unfair methods of competition as defined by 505/2 of the ICFA *et seq.*, and 510/2

of the Uniform Deceptive Trade Practices Act to the detriment of Plaintiff and the Subclass.

101.    Furthermore, each of the Defendants also violated section 505/2 through Defendants' use or employment of deception, fraud, false pretense, concealment, suppression, and/or omission of material facts with the intent to induce reliance.

***Defendant Emson's False Representations and Omissions***

102.    With the intent to induce reliance, Defendant Emson purposefully conceals, suppresses, and/or omits that (1) it shares with or makes available to third parties its consumers' private billing, contact, and order information, including to Defendants Quality Resources and Sempris and (2) that Quality Resources would thereafter use such information to initiate telemarketing calls to consumers. Further, Emson acted in a deceptive manner by actually transferring consumers' private billing, contact, and order information to third parties, including Defendant Quality Resources, and allowing Quality Resources to use such information in its telemarketing calls. Defendant Emson never clearly disclosed that it would make available or share consumer personal information in such a manner.

103.    These omitted and concealed facts are material because they were likely to influence a consumer's decision of whether or not to purchase one of Emson's advertised products and provide Emson with access to his or her billing and contact information. Further, Emson intended that Plaintiff and the Subclass would rely on its deceptive conduct by both providing Emson with access to their billing and contact information and by consummating their purchases of Emson products.

104.    Plaintiff and the Subclass were deceived and/or misled by Emson's deceptive conduct and omission of material facts, and suffered harm when Quality Resources used their private billing, contact, and order information to deceptively enroll them in Sempris Membership

Programs, as well as when Sempris charged Plaintiff and the Subclass recurring membership fees.

***Defendant Quality Resources's False Representations and Omissions***

105.    With the intent to induce reliance, Defendant Quality Resources purposefully employs the use of deception, fraud, concealment, misrepresentation, and/or omission of material facts when marketing Sempris's membership programs to consumers.

106.    Specifically, Quality Resources acted in a deceptive manner by:

(1)    making it appear as if the marketed programs are offered by Emson (a company with which the consumer has had a previous business relationship) or related to the consumer's Emson order;

(2)    deceptively placing telemarketing calls under the false pretense of verifying a consumer's previous Emson order when, in reality, the call's only purpose is to market various membership programs;

(3)    utilizing marketing scripts designed to confuse and deceive reasonable consumers regarding the price and benefits of its marketed membership programs, including those offered by Sempris;

(4)    utilizing marketing scripts designed to confuse and deceive reasonable consumers regarding when membership trial periods would begin and end, when monthly membership charges would begin, and when written materials (and their effect) would be sent to consumers; and

(5)    utilizing marketing scripts designed to deceptively deflect consumer questions regarding the nature, source, terms, and benefits of its marketed membership programs.

107.    Quality Resources further acted deceptively by:

27

(1)    concealing or omitting the fact that consumers were unlikely to ever receive any of the printed membership materials for review or would not receive such materials until after the expiration of the membership trial periods and monthly recurring charges had commenced;

(2)    concealing or omitting the fact that consumers would have no meaningful opportunity to try out program benefits, review written membership materials, or call and cancel membership before monthly recurring charges would be assessed;

(3)    concealing or omitting the fact that consumers were unlikely to ever receive any of the gift cards, vouchers, and/or rebates that were promised as incentives for consumers to agree to try the marketed membership programs;

(4)    concealing, obscuring, or failing to make clear the true costs of its marketed membership programs (recurring monthly fees that would automatically and perpetually be billed unless the consumer affirmatively called to cancel), including the fact that Plaintiff's and the Subclass's accounts would be continually charged unless such consumers took affirmative action to avoid the charges, the date(s) the funds would be deducted, and the specific steps necessary to avoid the charges;

(5)    concealing, obscuring, or failing to make clear the termination, cancellation, and refund policies related to its marketed membership programs; and

(6)    concealing or omitting the fact that its marketed membership programs were offered and operated by Sempris and other third parties.

108.    These omitted and concealed facts are material because they were likely to influence a consumer's decision of whether or not to agree to the trial memberships marketed by Quality Resources and provide Quality Resources with confirmation of their billing and contact

information. Further, Quality Resources intended that Plaintiff and the Subclass would rely on its deceptive conduct and agree to enrollment in its marketed membership programs, including those offered by Sempris.

109.    Plaintiff and the Subclass did in fact rely upon Quality Resources's deception, fraud, and omission of material facts by agreeing to trial enrollments in Quality Resources's marketed membership programs, including the Sempris Membership Programs, and suffered harm in the form of recurring membership fees thereafter assessed and charged by Sempris. At the very least, had Quality Resources disclosed accurate information about the timing of charges, cancellations, and other information, Plaintiff and the Subclass members could and would have written down the cancellation information and promptly canceled within sufficient time to avoid recurring charges.

*Defendant Sempris's False Representations and Omissions*

110.    With the intent to induce reliance, Defendant Sempris purposefully employs the use of deception, fraud, concealment, and/or omission of material facts.

111.    Sempris acted in a deceptive manner by, among other acts:

(1)     encouraging, contributing to, and helping draft the deceptive representations and omissions made by Quality Resources when marketing its Membership Programs (as described above in Paragraphs 106 - 107);

(2)     in the alternative, grossly failing to adequately review Quality Resources's enrollment practices so as to ensure that consumers are not deceptively enrolled in Sempris Membership Programs;

(3)     failing to provide the gift cards, vouchers, and/or rebates that were promised as incentives for consumers to try Sempris's Membership Programs; and

(4)      failing to or serially delaying the mailing of written membership materials to consumers enrolled in its Membership Programs, such that members are unable to access membership benefits or cancel the Membership Programs before the expiration of their trial periods and the commencement of recurring monthly charges.

112.    Sempris intended that Plaintiff and the Subclass would rely on its deceptive conduct and agree to trial enrollment in its Membership Programs. Sempris further intended that Plaintiff and the Subclass would rely on its deceptive conduct by not writing down necessary cancellation information and by not cancelling their trial memberships before the commencement and imposition of recurring monthly charges.

113.    Plaintiff and the Subclass were deceived and/or misled by Sempris's deception, fraud, and omission of material facts, relied upon Sempris's deceptive conduct by agreeing to trial enrollment in Sempris's Membership Programs and by not writing down cancellation information or cancelling their memberships before being assessed recurring monthly charges, and suffered harm in the form of recurring membership fees charged by Sempris.

114.    Defendants Emson, Quality Resources, and Sempris's conduct is also unfair, oppressive, immoral, and unscrupulous.

115.    Without consent, Emson secretly shares its customers' information with Quality Resources for telemarketing purposes and allows Quality Resources to use its orders as a premise for contacting its customers.

116.    Quality Resources then bombards consumers with multiple membership offers in rapid succession such that consumers don't even realize they are being pitched new programs, speeds through the cancellation information and refrains from telling customers to write down such information, and falsely informs consumers that written materials will be timely sent

30

advising the consumer on how to cancel so as to avoid the charges.

117.    All the while, Sempris is aware of and facilitates Quality Resources's deceptive

conduct, fails to send promised materials to members on time (or ever), and otherwise fails to

provide anything of value to consumers in exchange for their monthly membership fees.

118.    The Defendants then share in the illicit profits made from charging the

membership fees to unwitting consumers pursuant to agreements or arrangements by and

between some or all of them.

119.    As a direct and proximate result of Defendants' immoral, unscrupulous, and

oppressive conduct, Plaintiff and the other Subclass members suffered damages by not

cancelling their Sempris memberships in time and incurring unwanted charges in the process.

120.    Under 815 ILCS 505/10a, Plaintiff seeks an order (1) requiring Defendants to

cease the unfair practices described herein; (2) requiring Defendants to restore to Plaintiff and

each Subclass member any money acquired by means of unfair competition (restitution) and

actual damages; and, (3) awarding reasonable costs and attorneys' fees pursuant to 815 ILCS

505/10a.

**SECOND CAUSE OF ACTION**
**Fraud by Omission**
**(Against Defendants Emson and Quality Resources)**
**(Individually and on behalf of the Sempris Class)**

121.    Plaintiff incorporates by reference the foregoing allegations.

122.    Based on Emson and Quality Resources's material omissions (as described in

Paragraphs 102 and 107), Plaintiff and members of the Class did not reasonably expect to be

enrolled in and charged recurring monthly membership fees for Sempris's Membership

Programs.

***Defendant Emson's False Material Omissions***

31

123.    Defendant Emson concealed from and failed to disclose to Plaintiff and Class members that (1) it would share their private billing, contact, and order information with disreputable third parties, including Defendants Quality Resources and Sempris and (2) that Quality Resources would thereafter use such information to initiate telemarketing calls to consumers.

124.    These omitted and concealed facts are material because they were likely to influence a consumer's decision of whether or not to purchase one of Emson's advertised products and provide Emson with access to their billing and contact information.

125.    Emson's concealment and omission of these material facts contributed to Plaintiff and Class members' confusion regarding the source and sponsorship behind the telemarketing calls they received from Quality Resources, as well as the source and sponsorship behind the Sempris Membership Programs that they were deceptively enrolled in.

126.    Although Emson was aware that its concealment of these material facts would lead Plaintiff and the Class to believe that the telemarketing calls and membership programs were offered and/or endorsed by it, and that Quality Resources would use the contact, billing, and order information it provided to deceptively telemarket to its customers, it did nothing to prevent or correct Plaintiff and Class members' misapprehension of such facts, which led to Plaintiff and Class members being deceptively enrolled in and charged for Sempris Membership Programs.

### *Defendant Quality Resources's False Material Omissions*

127.    Defendant Quality Resources concealed from and failed to disclose to Plaintiff and Class that:

(1)    its telemarketing calls were not necessary to verify consumers' Emson

orders;

(2)     it is a third party telemarketer and not an agent or employee of Emson;

(3)     consumers were unlikely to ever receive any of its promised written membership materials for review, or would not receive such materials until after the expiration of the membership trial periods and monthly recurring charges had commenced;

(4)     consumers would have no meaningful opportunity to try out program benefits, review written membership materials, or call and cancel membership before monthly recurring charges would be assessed;

(5)     consumers were unlikely to ever receive any of the gift cards, vouchers, and/or rebates that were promised as incentives for consumers to agree to try the marketed membership programs;

(6)     the true costs of its marketed membership programs (recurring monthly fees that would automatically and perpetually be billed unless the consumer affirmatively called to cancel), including the fact that Plaintiff's and the Class's accounts would be continually charged unless such consumers took affirmative action to avoid the charges, the date(s) the funds would be deducted, and the specific steps necessary to avoid the charges; and

(7)     that its marketed membership programs were actually offered and operated by Sempris and other third parties.

128.    These omitted and concealed facts are material because they were likely to influence a consumer's decision of whether or not to agree to the trial memberships marketed by Quality Resources and provide Quality Resources with confirmation of their billing and contact information.

129.    Quality Resources's intentional concealment and omission of these material facts

contributed to Plaintiff and Class members' confusion regarding the relationship between the telemarketing calls they received from Quality Resources and their Emson order, the terms of Quality Resources's marketed membership programs (including that of the Sempris Membership Programs), and the entity behind its marketed membership programs. Quality Resources's concealment and omission of these material facts further caused Plaintiff and Class members to believe that they would be sent membership materials in the mail and would have the opportunity to review the materials and try the programs before being charged recurring monthly fees, and led to Plaintiff and Class members agreeing to enroll in its marketed membership programs.

130.    Although Quality Resources was aware that its concealment of these material facts would lead Plaintiff and the Class to believe that (1) the telemarketing calls and membership programs were offered and/or endorsed by Emson, (2) that they would timely receive written membership materials in the mail, and (3) that they would have the opportunity to review such materials and call to cancel before being charged recurring monthly fees, it did nothing to prevent or correct Plaintiff and Class members' misapprehension of such facts, which led to Plaintiff and Class members being enrolled in and charged for Sempris Membership Programs.

131.    Defendants were under a duty to speak given their superior knowledge and position when compared to Plaintiff and the Class members.

132.    Plaintiff and the Class justifiably relied on the omissions of Emson and Quality Resources to their detriment.

133.    The detriment is evident from the unauthorized charges placed on Plaintiff's and Class members' accounts and the monies lost.

34

134.    As a direct and proximate result of Emson and Quality Resources's misconduct, Plaintiff and the Class have suffered and will continue to suffer actual damages in the form of monies taken by Sempris.

## THIRD CAUSE OF ACTION
### Fraudulent Inducement
### (Against Sempris and Quality Resources)
### (Individually and on behalf of the Sempris Class)

135.    Plaintiff incorporates by reference the foregoing allegations.

136.    As described with particularity herein, Quality Resources and Sempris intentionally made telemarketing offers that they knew or should reasonably have known were false and misleading so as to fraudulently induce enrollment into Sempris Membership Programs. This conduct includes, but is not limited to:

(1)    promoting and advertising Sempris Membership Programs while concealing the actual cost and terms of membership, material portions of any transaction,

(2)    initiating telemarketing calls to consumers under the guise of "confirming" their Emson orders, and

(3)    claiming that consumers would timely receive (and that Sempris would timely send) written materials relating to Sempris's Membership Program terms and cancellation procedures.

137.    Specifically, Quality Resources made misrepresentations to Plaintiff and Class members regarding the following:

(1)    the source and purpose behind its telemarketing phone calls, making it appear as if the marketed programs were offered by Emson and related to the consumer's Emson order;

(2)    that membership offers were to reward or thank the consumer for their

35

Emson order;

(3)     when membership trial periods would begin and end, and when monthly membership charges would begin;

(4)     that consumers would receive and be able to review printed membership materials, and try out membership benefits, before the expiration of the membership trial periods and monthly recurring charges would commence;

(5)     that consumers would be able call and cancel membership before monthly recurring charges would be assessed; and

(6)     that consumers would receive the gift cards, vouchers, and/or rebates promised as incentives for trying the marketed membership programs.

138.     Quality Resources further intentionally made misleading representations regarding the program's actual terms and costs, including:

(1)     emphasizing that the introductory fee was only $1,

(2)     obscuring and/or concealing the actual $29.95 monthly membership fee,

(3)     obscuring and/or concealing the automatic and negative-option nature of the billed membership fees,

(4)     obscuring and/or concealing the procedures and obligations for cancellation, including the time period during which consumers could cancel without being charged,

(5)     obscuring and/or concealing when the introductory period would start and end, and

(6)     obscuring and/or concealing the consequences of failing to take affirmative action to cancel. Quality Resources intentionally designed their membership scripts

36

and pitches, with Sempris's help as a co-conspirator, to be difficult to understand and likely to mislead the reasonable consumer, and were in fact confusing to the reasonable consumer.

139.     The price of a consumer product or service is a material term of any transaction because it directly affects a consumer's choice or, or conduct regarding, whether to purchase a product. Any deception or fraud related to the price of a product is materially misleading. Thus, the misrepresentation and concealment of the actual price of a product is likely to mislead a reasonable consumer who is acting reasonably under the circumstances.

140.     Sempris allowed and contributed to the deceptive and misleading representations made by Quality Resources when marketing its Membership Programs and further, failed to adequately review Quality Resources's enrollment practices so as to ensure that consumers were not deceptively enrolled in Sempris Membership Programs. Specifically, Sempris allowed or encouraged Quality Resources to make misrepresentations regarding:

        (1)     the gift cards, vouchers, and/or rebates promised as incentives for consumers to try Sempris's Membership Programs;

        (2)     the mailing of written membership materials to consumers enrolled in its Membership Programs, such that members are able to review membership benefits and information; and

        (3)     the timing and calculation of membership trial periods and when recurring monthly charges would begin.

141.     By committing the acts alleged in this Complaint, Quality Resources and Sempris have knowingly disseminated untrue and/or misleading statements in order to induce consumers to enroll in Sempris Membership Programs.

142.     Quality Resources and Sempris knew or should have known of the falsity of the

representations made regarding Sempris's Membership Programs.

143. Quality Resources and Sempris intended that consumers would rely and act upon their deceptive and fraudulent representations.

144. Plaintiff and members of the Class did, in fact, rely upon Quality Resources and Sempris's misrepresentations to their detriment. This detriment is evident from the unauthorized charges placed upon Plaintiff's and Class members' credit card and bank accounts. Accordingly, Plaintiff and members of the Class have suffered injury in fact and lost money in justifiable reliance on Quality Resources and Sempris's misrepresentations of material facts.

145. Plaintiff, on her own behalf, and on behalf of the Class, seeks an order (1) requiring Quality Resources and Sempris to immediately cease the unlawful practices alleged herein, and (2) awarding Plaintiff and the Class damages in an amount to be proven at trial, interest, and attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
#### Breach of Contract
#### (As against Defendant Emson)
#### (Individually and on behalf of the Sempris Class)

146. Plaintiff incorporates by reference the foregoing allegations.

147. Defendant Emson on the one hand, and Plaintiff and members of the Class, on the other, entered into valid and enforceable contracts whereby those Class members provided and Emson accepted payment in exchange for goods marketed and sold by Emson. In order to facilitate their purchases, Plaintiff and the Class provided Emson with access to their billing and contact information.

148. A material term of the contract entered into by Plaintiff and the Class members with Emson required that Emson only share Class members' billing and contact information with those expressly authorized to receive it. Likewise, a material term of the contract required Emson

to only bill Plaintiff and the Class for charges that they authorized. The contract also implicitly incorporated all laws in effect at the time the contract was made, including the Restore Online Shopper's Confidence Act. These terms are generally implicit in consumer sales contracts.

149.    Plaintiff and members of the Class did not consent to Emson releasing their billing or contact information to Quality Resources, nor did they consent to receiving any telemarketing calls from Quality Resources (made on behalf of Sempris and other third parties). At most, Emson obtained consent to share information with "reputable" third parties. Neither Quality Resources nor Sempris can reasonably be considered to be "reputable" third parties. Both are engaged in deceptive business practices at the center of their respective business models.

150.    Nor did Plaintiff and members of the Class contract with Emson to transfer their billing information for the purposes of allowing a third party to charge their accounts.

151.    As a result of its unlawful conduct alleged herein, Emson materially breached the terms of its merchant contracts with Plaintiff and the other members of the Class.

152.    Plaintiff and the other members of the Class have suffered damages in the form of monies lost as a direct result of Emson's acts and practices.

153.    Plaintiff, individually and on behalf of the Class, seeks damages for Emson's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

### FIFTH CAUSE OF ACTION
#### Alternative Claim for Breach of Contract
#### (As against Defendants Sempris and Quality Resources)
#### (Individually and on behalf of the Sempris Class)

154.    Plaintiff incorporates by reference the foregoing allegations.

155.    In the hypothetical event that Defendants can show that Plaintiff and the Class

39

entered into enforceable contracts despite Plaintiff and the Class's lack of assent to the actual terms of enrollment, any such agreement required Defendants to timely send written membership materials to Plaintiff and Class members containing information needed to access membership benefits and to cancel their respective enrollments. Defendants, specifically Quality Resources acting on Sempris's behalf, further promised that they would provide the gifts and vouchers promised in return for Plaintiff and the Class's agreement to enroll in the membership trial period.

156.    Plaintiff and the Class performed under the agreement by paying the introductory fee for their trial of Sempris's Membership Program(s).

157.    As a result of their unlawful conduct alleged herein, Sempris and Quality Resources materially breached the terms of their contracts with Plaintiff and the other members of the Class. Defendants breached the contract by serially delaying and/or failing to send out the promised written membership materials and gifts/vouchers. Defendants further breached the contract by charging Plaintiff and the Class recurring membership fees without Plaintiff and the Class having had an opportunity to review the promised written membership materials prior to the imposition of monthly charges.

158.    Defendants' breach of their agreements with Plaintiff and members of the Class caused Plaintiff and the other members of the Class to suffer damages in the form of recurring monthly charges incurred and lost as a direct result of Defendants' acts and practices. Plaintiff and members of the Class additionally were damaged in the amount of the lost value of the gift cards and vouchers they were promised but that they never received.

159.    Plaintiff, individually and on behalf of the Class, seeks damages for Sempris and Quality Resources's breach of contract, as well as interest, reasonable attorneys' fees, expenses,

and costs to the extent allowable.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment (*in the alternative to breach of contract*)
### (Individually and on behalf of the Sempris Class)

160.    Plaintiff incorporates by reference the foregoing allegations, excluding paragraphs 146 through 159.

161.    Defendant Emson knowingly received a monetary benefit from Plaintiff and the Class in the form of fees, revenue share, or other value given by Quality Resources and/or Sempris when Emson wrongfully permitted Quality Resources to obtain the Class members' contact and billing information. Quality Resources then used the information received from Emson to initiate deceptive telemarketing calls to Plaintiff and the Class members to enroll them in Sempris Membership Programs. Sempris later used this information to charge Plaintiff and the Class recurring monthly fees.

162.    Emson appreciates or has knowledge of such benefits.

163.    Emson has no valid basis to accept benefits that are derived from Sempris charging Class members' for unauthorized membership fees.

164.    Quality Resources knowingly received a monetary benefit from Plaintiff and the Class in the form of fees, revenue share, or other value given by Sempris after Quality Resources deceptively enrolled Plaintiff and the Class in Sempris Membership Programs.

165.    Quality Resources appreciates and/or has knowledge of those benefits.

166.    Plaintiff and the other members of the Class have no adequate remedy at law against Quality Resources.

167.    Sempris, knowingly and without authorization, charged the credit and debit accounts of Plaintiff and the other members of the Class for its Membership Programs.

168.    As a result, and despite having no valid or legal basis to do so, Sempris unjustly received and continues to receive a monetary benefit in the form of membership fees charged to those accounts.

169.    Sempris appreciates and/or has knowledge of those benefits.

170.    Under principles of equity and good conscience, Defendants should not be permitted to retain the benefits they wrongfully received from Plaintiff and the other members of the Class as a result of its unlawful conduct.

171.    Plaintiff, individually and on behalf of the Class, seeks restitution of all monies Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bonnie Daniell, on behalf of herself and the Class and Subclass, respectfully requests that this Court issue an order:

A.    Certifying this case as a class action on behalf of the Class and Subclass defined above, appointing Bonnie Daniell as Class Representative, and appointing her counsel as Class Counsel;

B.    Declaring that Defendants' actions, as set out above, violate the ICFA (815 ILCS § 505/1, *et seq.*) as fraudulent, immoral, unethical, and unscrupulous business practices; and constitute breach of contract, fraud by omission, fraudulent inducement, and unjust enrichment;

C.    Awarding all economic, monetary, actual, consequential, statutory, and compensatory damages caused by Defendants' conduct, and if the conduct is

42

proven to be willful, awarding Plaintiff and the Classes exemplary damages;

D.    Awarding injunctive relief as necessary to cease Defendants' violations of the ICFA (815 ILCS § 505/1, *et seq.*) and as otherwise necessary to protect the interests of Plaintiff, and the Classes;

E.    Awarding restitution against Defendants for all money to which Plaintiff and the Classes are entitled in equity;

F.    Awarding Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees;

G.    Awarding Plaintiff and the Classes pre- and post-judgment interest, to the extent allowable;

H.    Entering such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Classes; and

I.    Awarding such other and further relief as equity and justice may require.

**JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable

Respectfully submitted,

**BONNIE DANIELL**, individually and on behalf of all others similarly situated,

Dated: August 28, 2013

By: /s/ Alicia E. Hwang
One of Plaintiff's Attorneys

Jay Edelson
Steven L. Woodrow
Rafey S. Balabanian
Christopher L. Dore
Benjamin H. Richman
Alicia E. Hwang

43

EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378
Firm ID: 44146

### CERTIFICATE OF SERVICE

I, Alicia E. Hwang, certify that I served copies of the foregoing *Plaintiff's Second Amended Class Action Complaint* to the following counsel via U.S. and electronic mail on August 28, 2013:

JENNER & BLOCK LLP
Craig C. Martin
David Jimenez-Ekman
Matthew R. Devine
Brienne M. Letourneau
353 N. Clark Street
Chicago, IL 60654-3456

LEAHY, EISENBERG & FRAENKEL, LTD.
Howard B. Randell
Patti M. Deuel
Adam T. Peterson
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603

By: /s/ Alicia E. Hwang

44